UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| **United States of America,** | |
| Plaintiff, | |
| v. | **No. 22 CR 643** |
| **Robert L. Murray, Jr.**, | Judge Manish S. Shah |
| Defendant. | |

## Defense Sentencing Memorandum

Defendant Robert Murray, through undersigned counsel, respectfully submits this sentencing memorandum. The defense recommends that the Court impose the sentence of time already served, to be followed by a three-year term of supervised release.

**1.    There is insufficient evidence to support a two-level enhancement for abuse of a position of private trust under USSG §3B1.3**

The defense objects to the two-level enhancement for abuse of a position of trust. The government argues that the enhancement applies in this case because Mr. Murray is a retired Chief Petty Officer in the U.S. Navy, and fellow servicemembers and veterans feel camaraderie for each other. *See, e.g.*, Gov. Memo, at 1 ("Murray raised more than $342,000 from dozens of active-duty service members, reservists, and other Navy veterans who shared his interest in trading and trusted him."); *id.* at 9 ("It was that mutual trust among current and former service members, and in particular, fellow Navy chiefs, which enabled Murray to raise money from so many people in this case").

This is an insufficient basis for applying the two-level abuse-of-private trust enhancement. Application note 1 to USSG §3B1.3 defines "public or private trust" as

> *a position* of public or private trust *characterized by professional or managerial discretion* (i.e. substantial discretionary judgment that is ordinarily given considerable deference). Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature. For this adjustment to apply, *the position* of public or private trust *must have contributed in some significant way to facilitating* the commission *or concealment* of the offense.

(Emphasis added.) The application note provides several examples of what does and does not qualify:

> This adjustment, for example, applies in the case of an embezzlement of a client's funds by an attorney serving as a guardian, a bank executive's fraudulent loan scheme, or the criminal sexual abuse of a patient by a physician under the guise of an examination. This adjustment does not apply in the case of an embezzlement or theft by an ordinary bank teller or hotel clerk because such positions are not characterized by the above-described factors.

Note that, under the application note, it is the *position itself*, rather than a victim's opinion of the offender's personal history, that matters for the analysis. The application note offers an attorney, a bank executive, and a physician as examples. But the note does not stop the analysis there, instead going on to consider the relationship between the position and the crime. In each example, the enhancement applies not merely because the offender is an attorney, or bank executive, or a physician, but rather because the offender *used* that position to commit the offense: the lawyer is able to steal the client's money because they are the guardian, or the physician is able to abuse the patient during a medical examination.

Yet the Government supports its argument only by pointing to victim C.N.'s impact statement, in which he states: "Robert used the inherent trust gained only

by becoming a Chief Petty Officer in the U.S. Navy. This is something I hold dear in my heart. People lie. I get it. But Chiefs are supposed to always be honest, especially amongst one another. Being taken advantage of by one of your 'brothers' is a hard pill to swallow." Gov. Memo, at 9. The Government's error is conflating *trusting someone* with *being in a position of trust*. The 1st Circuit pointed out this same analytical error in *United States v. Sicher*, 576 F.3d 64, 73 (1st Cir. 2009): "[T]estimony by individuals that they trusted someone who betrayed their trust does not itself establish that the position was a position of trust." While personal trust is not irrelevant to the question, the enhancement must be supported by more evidence than simply a victim's subjective trust in an offender. But that mere fact is all the Government offers to support its argument. The law requires more before applying this enhancement.

The government also asserts in passing that the victim investors were veterans or active-duty military members who "did not make a lot of money", such as one victim who reportedly saved money for "months" to invest with Murray, and another who borrowed money from family to invest. Even if it were true that the victims were impoverished (it is not[1]), that has no bearing on whether the abuse-of-trust enhancement applies. The Government cites no authority to the contrary.

Moreover, the government cannot show that Mr. Murray's veteran status contributed in a significant way to facilitating the commission of the offense. Many of the victim investors were interviewed by law enforcement, but only C.N.

---

[1] All the victims were Chief Petty Officers, which is a title that applies to pay grade E-7 and above. For an E-7 with 16 years of service, the base pay in 2021 was $4,895.10 per month. E-8s and E-9s with 16 years of service earned $5,260.50 and $6,114.90, respectively. The amounts are even higher for those with longer service. Nor does this account for other allowances military personnel are entitled to on top of their base pay, such as clothing and housing allowances or incentive and hazard pay. Nor does it take into account additional benefits including free medical care for the active duty servicemember and their families. Given that all these victims were well-paid career military members, the Government goes too far in claiming that as a group they were impoverished, vulnerable victims.

stated that Mr. Murray's status as a retired Chief Petty Officer was the determining factor in his decision to trust Mr. Murray. The other victim investors told the government that they invested with Mr. Murray because he appeared to be good at investing. All the victim investors and Murray belonged to the same Facebook group which was specifically organized for people (in this case Navy Chief Petty Officers) who were interested in investing. Many group members posted their investing victories, and the subject of their discussions was investing money.

2.    **Sentences of similarly situated defendants**

The probation officer and government recommend a sentence of 27 months. This recommendation is based on probation's guideline calculation, which includes the disputed two-level abuse of trust enhancement, for a final offense level 16 and criminal history is category I, placing his advisory guideline range at 21—27 months. The defense's position is that Mr. Murray's final offense level should be 14, which, when combined with a category I criminal history score, places his advisory guideline range at 15—21 months.

In the last five years, there were 16,924 cases nationwide where a criminal history category I defendant was sentenced under guideline §2B1.1[2]. Nearly 32% of those similarly situated defendants received no term of imprisonment at all,

_____

[2] All statistics referenced in this section are compiled from data kept by the U.S. Sentencing Commission, using the online data analyzer tool. USSC Interactive Data Analyzer Tool

instead serving a term of probation, probation with alternatives, or paying a fine. See Fig. 1.



Figure 1

Of the nationwide group of similarly situated defendants who received some period of incarceration, 71% received sentences shorter than two years. *See* Fig. 2 (on following page).



Figure 2

The median sentence for these similarly situated defendants was 8 months. *See* Fig. 3.



Figure 3

During the same time period, the statistics for the 879 similarly situated defendants in the Seventh Circuit echoed the national statistics. 34% of the 879 similarly situated defendants in the Seventh Circuit received a sentence of probation, probation with alternatives, or paid a fine. Nearly 71% of these similarly situated defendants who received prison sentences were incarcerated for less than two years.

In the Northern District of Illinois in the last five years, 33% of the 360 similarly situated defendants received a sentence of probation or probation with alternatives. 73% of defendants in this group who were sentenced to incarceration in the same time period received a sentence of less than two years, with a median sentence of six months. *See* Fig 4.



Figure 4

DEFENSE SENTENCING MEMORANDUM

Based on this data, a sentence of 27 months as the Probation Office[3] and government recommend is higher than sentences for similarly situated defendants, and greater than necessary. When these statistics are considered in conjunction with mitigating factors discussed in the history and characteristics supplement, it is sufficient, but not greater than necessary, for the court to give Mr. Murray a below-guidelines sentence of time already served.

3.      **History and characteristics of the defendant**

This section will be filed separately. Mr. Murray has been detained in the Anchorage Correctional Complex since March 7, 2024, which has severely impacted counsel's ability to review the PSR and confer with Mr. Murray on the information contained in the PSR. The Alaska Department of Corrections has not yet processed counsel's request to establish a Securus account that allows for confidential attorney calls, despite submitting the required information on March 19, 2025, following the last hearing in this case. Counsel will continue efforts to reach Mr. Murray but may be unable to review the PSR with him until the marshals return him to Chicago for sentencing. Counsel intends to file a supplement to this sentencing memo once she has an opportunity to review the PSR and discuss the personal history and characteristics with Mr. Murray.

As of today's date, Mr. Murray remains in custody in Alaska and counsel is unaware of any travel plans the marshals have made to secure his appearance on April 30 for sentencing.

4.      **Deterrence does not require a lengthy sentence**

Research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield

---

[3] Sentencing Recommendation, at 1

significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006).

This conclusion is borne out in the U.S. Sentencing Commission's March 2016 report, *Recidivism Among Federal Offenders: A Comprehensive Overview*. Among the report's key findings is that "with the exception of very short sentences (less than 6 months), the rate of recidivism varies very little by length of prison sentence imposed (fluctuating between 50.8% for sentences between 6 months to 2 years, to a high of 55.5% for sentences between 5 to 9 years)."

More recently, the University of Chicago published a meta-analysis of the deterrent effect of custodial sentences. *See* Petrich, et al., *Custodial Sanctions and Reoffending: A Meta-Analytic Review* (Sep. 22, 2021). In their abstract, the study's authors summarized their findings:

> Previous narrative reviews and meta-analyses concluded that the overall effect of imprisonment is null. Based on a much larger meta-analysis of 116 studies, the current analysis shows that custodial sanctions have no effect on reoffending or slightly increase it when compared with the effects of noncustodial sanctions such as probation. This finding is robust regardless of variations in methodological rigor, types of sanctions examined, and sociodemographic characteristics of samples. All sophisticated assessments of the research have independently reached the same conclusion. The null effect of custodial compared with noncustodial sanctions is considered a "criminological fact." **Incarceration cannot be justified on the grounds it affords public safety by decreasing recidivism**.

Given the empirical evidence regarding the limited deterrent effect of custodial sentences, a sentence of time already served is sufficient but not greater than necessary to deter Mr. Murray. There is no additional deterrent effect, either general or specific, for a longer sentence.

**5.    Recidivism risk[4]**

Mr. Murray is now 45 years old. U.S. Sentencing Commission data shows that recidivism risk decreases with age, dropping sharply after age 25. The reconviction rate for offenders in criminal history category I is a mere 4%. Put another way, **96%** of offenders in criminal history category I do *not* reoffend. Mr. Murray received one criminal history point. Similarly, only 5.5% of offenders with one criminal history point were reconvicted after release. Mr. Murray has other factors that also reduce his recidivism risk, which will be discussed in more detail in the sealed supplement to this memo.

Accordingly, the sentencing concerns of incapacitation and protecting the public from further criminal activities by the defendant are slight in this case, which means the need for a lengthy prison sentence is significantly diminished.

**6.    A fine is not appropriate**

The guidelines note that the Court "shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." USSG § 5E1.2(a). Mr. Murray is unable to pay a fine and is not likely to become able to pay a fine.

Mr. Murray lives on a fixed income. He was rated 100% disabled by the Veteran's Administration and is unable to work. At present, he receives a pension and disability benefits related to his injuries during his military service, however, that income will be terminated on May 7, 2025, if Mr. Murray is incarcerated on that date. According to the Department of Veteran's Affairs website, veterans who are incarcerated longer than 60 days will have their pension payments terminated on the 61st day of incarceration. Likewise, his disability income will be drastically

---

[4] All statistics in this section are taken from *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* (2004), available at USSC Publications

reduced from the $3,831 per month allotted to disabled, single veterans with no minor children and a 100% disability rating, to $175 per month, which is the current rate for a disabled, single veteran with no minor children and a 10% disability rating. He may or may not be eligible to reapply for both his pension and disability benefits once he is released, but whether his benefits are reinstated at all, let alone at the same rate is an open question.

The Court appointed counsel to represent Mr. Murray under the CJA due to his lack of financial resources. Mr. Murray's income once released is uncertain. If he is incarcerated for longer than 60 days, he will lose his disability payments and will have to reapply for benefits, a process which can take months and requires multiple doctor's appointments and interviews, making it unlikely that he will be able to pay a fine in the future. Mr. Murray will also be paying restitution, further impacting his ability to pay a fine in the future. Consequently, the defense requests that the Court decline to impose a fine.

**7.    Objections to discretionary conditions of supervised release**

*Partial objection to Discretionary Condition 16*: Mr. Murray is a disabled veteran who is unable to work, making the condition allowing probation to visit him at his workplace unnecessary.

Respectfully Submitted,

/s/ Holly N. Blaine
Attorney for Robert L. Murray, Jr.

Holly N. Blaine
BLAINE & VANZANT, LLP
922 Davis Street
Evanston, Illinois 60201
(312) 788-7584
hnb@blainevanzant.com