UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| **United States of America,** | |
| Plaintiff, | |
| v. | **No. 22 CR 643** |
| **Robert L. Murray, Jr.**, | Judge Manish S. Shah |
| Defendant. | |

## Defense Response to Government's Sentencing Memorandum

1. **There is insufficient evidence to support a two-level enhancement for abuse of a position of private trust under USSG §3B1.3**

The government argues for the first time in their response to the defense sentencing memo that the position of private trust enhancement is not based on the shared military service of Mr. Murray and the investors, but is instead based on (1) Murry's status as the sole operator and manager of the LLC in which the victims invested, (2) the discretion vested in him by the operating agreement in conducting business operations and investments, and (3) Murry's unique access to and control over the investment funds. *See* Gov. Resp. Memo, at 1.

This is the first time the government has raised this argument. In the Government's Version of the Offense (GVO) submitted to the probation office, the government stated only, "The offense level should be increased by an additional 2 levels pursuant to Guideline § 3B1.3 because MURRAY abused a position of trust in a manner that significantly facilitated the commission and concealment of the offense." GVO, at 10 (PSR, at 39). The government did not elaborate on the factual basis for the enhancement.

Similarly, the government's sentencing memorandum simply stated, "The government does not object to any of the Probation Officer's Sentencing Guideline calculations, summarized below.... The offense level is increased by an additional 2 levels pursuant to Guideline § 3B1.3 because Murray abused a position of trust in a manner that significantly facilitated the commission and concealment of the offense. *Id.* at 9 ¶¶35-36." Gov. Memo, at 3. The government did not elaborate. The portion of the PSR that the government cites to states, in full:

> 35. **Adjustment for Role in the Offense**: It is the government's position that the offense level should be increased by two levels because the defendant abused a position of trust in a manner that significantly facilitated the commission or concealment of the offense. The defendant reserves the right to contest the application of this enhancement but has not provided any argument or evidence as of the date of this report.
>
> 36. The defendant is a retired United States Navy veteran, who achieved the rank of Chief Petty Officer. He connected with members of the Naval community through social media networks. During the scheme, the defendant purported to be a financial expert in securities trading. He targeted numerous active duty, reservist, and veteran military members to invest in the scheme. *Given his extensive military background and the shared military status with his victims, Murray created a sense of camaraderie that is built through the armed services. He did this to gain the victims' trust in handling their money. As such, the offense level should be increased by two levels.* USSG §3B1.3.

PSR ¶¶ 35–36 (emphasis added). As the emphasized passage makes clear, the Probation Office premised the abuse-of-trust enhancement on the proposition that Murray used his *military background and status* to gain the victims' trust. Nowhere does the Probation Department state that the enhancement is premised on his status as sole operator and manager of the LLC, much less the discretion and control over funds that the operating agreement vested in him. Yet the government only now raises these arguments in its response to the defense sentencing memorandum. It is well settled that the failure to raise an argument results in forfeiture.

Even so, it is ultimately the Court, not the government, that must calculate the guidelines. If the court is inclined to forgive the government's forfeiture of its argument, the facts of this case still do not meet the criteria for application of this enhancement. As the government points out, there are generally two situations in which the abuse-of-private-trust enhancement applies. *See* Gov. Resp. Memo, at 2. "The first category includes 'people like doctors, lawyers, and *investment advisors who have (or hold themselves out as having) specialized expertise* that leaves the average layman ill-equipped to monitor their job performance.'" *Id.* (quoting *United States v. Tiojanco*, 286 F.3d 1019, 1020 (7th Cir. 2002) (emphasis in government's memo)). The second category is "organizational settings, where businesses or similar entities charge particular employees with deciding, on a case-by-case basis, whether a particular expenditure or transfer of company funds or other valuables is necessary or beneficial to the organization." *Id.*

The government contends that Murray's social-media posts are sufficient to place this case in the first category. But in neither of the examples the government cites and attaches to its response memorandum does Murray hold himself out as a professional investment advisor, much less one with extensive experience. *See* Gov. Resp. Memo, at 4 n.1. Murray simply explains the purpose of the proposed LLC and summarizes his proposed investment plan.

The government alternatively contends this case falls into the second category by virtue of Murray's position as the sole operator and manager of the LLC. This argument is more colorable on the facts of this case, but it overlooks the other requirement for the enhancement: the position must have "*significantly* facilitated the commission or concealment of the offense". USSG § 3B1.3 (emphasis added). Although Murray was vested with discretion to conduct the business of the LLC, the investors in this case were also Members of the LLC. They consequently had

the legal right to inspect the LLC's books at any reasonable time, and additionally "any advice or request maybe [*sic*] made by any Member to the Manager relating to the company's financial transaction." [70-1], at 5.

This is different than situations such as, for example, a brokerage or investment bank, where the investors are mere customers who deposit their money in a brokerage account managed by a professional. Here, the investors were co-Members of the LLC with Murray, that is, actual owners of the company rather than customers. It also must be noted that the victims in this case were not unsophisticated neophytes in the investment world. They were instead all experienced and sophisticated investors who were each involved in a Facebook group "comprised of numerous active-duty service members, reservists, and veterans, and was called the 'Goats Investment Group.'", which was "a Facebook group comprised of Navy Chiefs interested in investing." PSR, ¶ 8.

Based on these facts, the enhancement for abuse of a position of private trust should not be applied.

2. **Statistics kept by the U.S. Sentencing Commission represent similarly situated defendants**

The government takes issue with the defense's use of U.S. Sentencing Commission statistics to identify sentences imposed on similarly situated defendants, calling them "so broad, and so general, as to be practically useless for purposes of comparison." Gov. Resp., at 7.

The U.S. Sentencing Commission disagrees. In its Introduction to the 2024 *Sourcebook of Federal Sentencing Statistics*, the Commission explains:

> The Commission collects and analyzes data on federal sentences to support its various activities. As authorized by Congress, the Commission's numerous research responsibilities include: (1) the establishment of a research and development program to serve as a clearinghouse and information center for the collection, preparation, and dissemination of information on federal sentencing practices; (2) the publication of data

> concerning the sentencing process; (3) t*he systematic collection and dissemination of information concerning sentences actually imposed and the relationship of such sentences to the factors set forth in section 3553(a)* of title 18, United States Code; and (4) the systematic collection and dissemination of information regarding the effectiveness of sentences imposed.

(Emphasis added.) The Commission makes this data publicly available through its Interactive Data Analyzer, and it also issues a variety of research reports assessing sentencing data.

The annual sourcebook contains a wealth of sentencing information, but for present purposes the key report is *Inter-District Differences in Federal Sentencing Practices* (Jan. 2020). The introduction explains:

> This report, the third in the series, builds directly upon the Commission's Intra-City Report. As noted in that publication, *the Commission's ongoing analysis in this area directly relates to a key goal of the Sentencing Reform Act of 1984: reducing unwarranted sentencing disparities* that existed in the federal judicial system. In particular, the Act was the result of a widespread bipartisan concern that such disparities existed both regionally (e.g., differences among the districts) and within the same courthouse.

*Id.*, at 6. In the methodology section, the Commission notes that it uses the guideline minimum as the benchmark for its comparative analysis:

> For each case, the guideline minimum and the actual sentence imposed were determined, and a percent difference between the two was calculated….
>
> The guideline minimum was chosen as the baseline for analysis because of the gravitational pull it tends to have on sentences. The Supreme Court has directed "benchmark" and "starting point" in the post-Booker federal sentencing process and to "remain cognizant" of it during all three steps of the "Booker three-step process" used at federal sentencing.

*Id.*, at 18. To state the obvious, the guideline minimum is necessarily determined by a defendant's Final Offense Level and Criminal History Category. The Commission used this benchmark to compare sentencing outcomes by primary guideline. *See id.*, at 16 (Analysis By Primary Guideline):

> In creating the datasets, the Commission identified 972,783 cases across the nation during fiscal years 2005 to 2017. The Commission then

> isolated the relevant cases for each guideline-specific analysis by limiting cases based on their primary guideline—that is, the guideline with the highest adjusted offense level, which therefore controlled the guideline calculation. *For example, the §2B1.1 analysis includes only those cases in which §2B1.1 was the primary guideline.*

*Id.*, at 16–17 (emphasis added).

In short, the Commission examines sentencing disparities by comparing sentencing outcomes based on (1) the primary guideline, (2) the final offense level, (3) the criminal history category, and (4) the sentence imposed. That is precisely the data the defense has presented, and that the government asks the Court to reject out of hand as "practically useless for purposes of comparison".

To be fair, it can be useful and interesting to delve further into case statistics to compare them in greater detail. The Commission's dataset includes a daunting array of variables that can be examined, including Specific Offense Characteristics, Base Offense Levels, and so on. *See* Variable Codebook for Individual Datafile, FY 1999–2023. But two practical barriers counsel against using more granular statistics at an individual sentencing hearing. First, the datafiles are formatted for SAS and SPSS, which to even open require advanced data analysis software that is expensive and difficult for non-specialists to learn and use effectively. The Interactive Data Analyzer was created specifically to address that problem. Second, the Commission cautions against using too many variable filters:

> Using several filters at one time can result in a small number of cases in any particular table or figure. For example, when using numerous filters, it may be possible that some figures will display percentages or averages of a very small number of cases. The Commission cautions that analyses based on small populations may have limited informational value in discerning trends, generalizing to larger populations, or making other statistical observations.

Interactive Data Analyzer, Ask IDA (click question mark for pop up). For the purpose of comparing the sentences of similarly situated defendants at an individual sentencing hearing, the broader dataset sorted by primary guideline and

criminal history category is the most appropriate and is used by the Commission itself.[1]

As a final point, it is worth asking: if this methodology is not appropriate for comparing similarly situated codefendants, as section 3553(a) requires, then what methodology is? The government does not provide an answer, nor does it present any affirmative argument whatsoever regarding similarly situated co-defendants.

Respectfully Submitted,

/s/ Holly N. Blaine
Attorney for Robert L. Murray, Jr.

Holly N. Blaine
James G. Vanzant
BLAINE & VANZANT, LLP
922 Davis Street
Evanston, Illinois 60201
(312) 788-7584
hnb@blainevanzant.com
jgv@blainevanzant.com

---

[1] It would be more helpful if the IDA also allowed filtration by final offense level, but that is not yet available. The best option currently available is the data presented by the defense.